IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AbbVie Inc., | ) | |
| | ) | |
| Plaintiff, | ) | No. 24-cv-8167 |
| | ) | |
| v. | ) | Judge Jeffrey I. Cummings |
| | ) | |
| BeiGene, LTD., BeiGene (Beijing) Co., | ) | |
| Ltd., Huaqing Liu, and Does 1–10, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff AbbVie Inc. brings a complaint against BeiGene, Ltd., BeiGene (Beijing) Co.,

Ltd. (together, "BeiGene"), Huaqing Liu, and Does 1–10, pursuant to the Defend Trade Secrets

Act, 18 U.S.C. §1832, *et seq.*, (the "DTSA") and the Declaratory Judgment Act, 28 U.S.C.

§2201. AbbVie alleges that BeiGene lured "retired," former AbbVie Senior Research Scientist

Dr. Huaqing Liu to its employ as Executive Director of its Department of Chemistry in order to

gain access to trade secrets concerning a chemical compound (known as the BTK degrader

program) that AbbVie is developing as a cancer therapy. AbbVie further alleges that defendants

conspired to and did immediately use AbbVie's trade secrets to dramatically change the course of

BeiGene's own development of the same compound. (Dckt. #1).

Defendants have moved to dismiss plaintiff's Complaint pursuant to Federal Rule of

Civil Procedure 12(b)(6), asserting that (1) AbbVie does not allege that Liu took any tangible

information from AbbVie to BeiGene, (2) AbbVie does not plead any protective measures that

are specially applicable to its BTK degrader program, (3) AbbVie has failed to plausibly plead

that the discoveries disclosed in BeiGene's patent applications were derived from AbbVie, and (4) the Complaint fails to adequately specify AbbVie's alleged trade secrets. (Dckt. #39 at 7–8).

Defendants' arguments—which, among other things, rely on inapposite cases, ignore Circuit precedent, and would require the Court to draw inferences in their favor and not AbbVie's—are unavailing and the Court finds that AbbVie has properly pled a DTSA claim. Accordingly, defendants' motion to dismiss, (Dckt. #38), is denied.

## I.       LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires a plaintiff to "go beyond mere speculation or conjecture." *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 495 (7th Cir. 2025). The complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A complaint that satisfies this standard is 'well-pleaded' and may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Berk v. Choy*, 146 S.Ct. 546, 553 (2026) (cleaned up); *Orr v. Shicker*, 147 F.4th 734, 740 (7th Cir. 2025) (recognizing that the "notice-pleading standard is deliberately undemanding.") (cleaned up). As such, the Federal Rules require "no more than a statement of the claim" without the pleading of evidence to support it, *Berk*, 146 S.Ct. at 553.

When considering a motion to dismiss under Rule 12(b)(6), the Court "constru[es] the complaint in the light most favorable to the plaintiffs and accept[s] all well-pleaded factual allegations as true." *Horist v. Sudler & Co.*, 941 F.3d 274, 278 (7th Cir. 2019); *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024). Moreover, the Court is required to draw all reasonable inferences in favor of plaintiff, and it cannot draw inferences in favor of the moving

2

defendants.  *See, e.g.*, *Marks v. CDW Comput. Ctrs., Inc.*, 122 F.3d 363, 367–68, 370 (7th Cir. 1997) (reversing Rule 12(b)(6) dismissal where the district court improperly drew inferences against the plaintiff and in favor of the defendant).  Finally, in opposing a Rule 12(b)(6) motion, a plaintiff is free to "elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings."  *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 n.2 (7th Cir. 2021) (cleaned up).  In sum: dismissal is only warranted if "no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Christensen v. Cnty. of Boone*, 483 F.3d 454, 458 (7th Cir. 2007).

## II.  RELEVANT FACTS

The Court draws the following facts below from plaintiff's Complaint.  (Dckt. #1).

### A.  AbbVie's BTK Degrader Program

AbbVie is a global biopharmaceutical company headquartered in North Chicago, Illinois that formed as the result of a corporate separation from Abbott Laboratories in 2013.  (*Id.* ¶¶3, 38).  AbbVie has invested "substantial resources" in developing compounds for treating cancer, among other diseases.  (*Id.* ¶¶40–41).

As part of its cancer treatment research efforts, AbbVie researches cancer therapies that act by disrupting the activity of the Bruton's tyrosine kinase ("BTK") protein.  (*Id.* ¶41).  Certain blood and bone marrow cancers, in particular, can be treated effectively with compounds that disrupt the function of BTK.  (*Id.* ¶42).  BTK degraders are a class of such compounds that selectively degrade BTK, and thus treat cancer by removing BTK from a patient's system.  (*Id.* ¶43).

BTK degraders generally have three main components: a target binding ligand ("TBL"), an E3-ligase binding ligand ("LBL"), and a "linker" that connects the two.  (*Id.* ¶44).  AbbVie scientists research "each of these three main components, combinations of these three main

components," and "BTK degraders as a whole" to learn about helpful and problematic design features of BTK degrader compounds. (*Id.* ¶45). Researchers in AbbVie's BTK degrader program have "invented, designed, developed, synthesized, and tested" BTK degraders comprising "different TBL designs, LBL designs, linker designs, TBL-linker and LBL-linker combination designs, and TBL-linker-LBL combination designs." (*Id.* ¶53). Through its BTK degrader research program, which has involved "numerous years and many million dollars" of investment, (*id.* ¶70), AbbVie has developed a BTK degrader clinical candidate, ABBV-101, that is presently in Phase 1 clinical trials, (*id.* ¶45).

### B. AbbVie's Trade Secrets

AbbVie alleges that it has created and sufficiently protected "numerous valuable trade secrets" associated with its BTK degrader program. (*Id.* ¶53). These trade secrets "were discovered and built upon by AbbVie employees acting within the course and scope of their employment for AbbVie, using AbbVie resources." (*Id.* ¶62). They "were not in the public domain, nor were they matters of general knowledge in the trade or of special persons who are skilled in the trade" prior to defendants' disclosure of the alleged trade secrets. (*Id.* ¶64).

AbbVie describes the following trade secrets, (*id.* ¶51):

- linker designs containing "relatively short and less flexible cyclic amine structures;" TBL designs containing "structurally-tailored and optimally-oriented BTK scaffolds;" and LBL designs "devoid of thalidomide-, lenalidomide-, or pomalidomide-based chemical structures," all of which have valuable pharmacological properties in combination with certain linker, TBL, and/or LBL designs, (*id.* ¶53(i)–(iii));

- TBL-linker, LBL-linker, and TBL-linker-LBL combination designs that have valuable pharmacological properties in combination with certain LBL or TBL designs, (*id.* ¶53(iv)–(vi));

- "scientific information and data" about how specific modifications to each BTK degrader component and/or combination affect the pharmacological properties of a BTK degrader compound, (*id.* ¶53(vii)); and

4

- "scientific information and data" about development plans and priorities in AbbVie's BTK degrader program, (*id.* ¶53(viii)).

AbbVie includes images of certain alleged trade secrets for nine linker designs (labeled L1 through L9), three TBL designs (labeled TBL1 through TBL3), one TBL-linker design (TBL-linker 1), and three LBL-linker designs (labeled linker-LBL 1 through linker-LBL 3). (*Id.* ¶¶54, 56, 58, 60). AbbVie's BTK degrader designs "differ" from what was known in the field due to their unique chemical structures, which enable "substantial improvements" in the pharmacological properties of BTK degraders. (*Id.* ¶68).

AbbVie alleges that it implemented extensive policies and procedures to maintain the secrecy of its trade secrets and confidential information, including "computer controls, limitations on data access, network security, user setup procedures, password administration and management, security audits, security breach investigations, email best practices, and mobile device security." (*Id.* ¶76). Internally, AbbVie policy requires its employees to maintain trade secrets and confidential information in confidence and not disclose them to any unauthorized third party. (*Id.*). AbbVie employees receive training on the company's Code of Business Conduct, which emphasizes that "[w]e are especially careful to protect proprietary information— knowledge that AbbVie owns and uses to our competitive advantage in the marketplace." (*Id.* ¶88).

AbbVie limits access to BTK degrader trade secrets and other confidential and proprietary information to certain employees who are approved by critical function stakeholders. (*Id.* ¶¶79–80). The company stores its trade secrets electronically in a secure network system that it routinely audits and relies on various physical and technological security measures to ensure that anyone accessing BTK degrader trade secrets is authorized to do so. (*Id.* ¶¶80–87).

Per company policy, "[n]o agent or employee of AbbVie who has been entrusted in the course of employment" with AbbVie's BTK degrader trade secrets "may thereafter utilize" them "against the interests or to the prejudice of AbbVie." (*Id.* ¶90). AbbVie protects its BTK degrader trade secrets and related confidential information from disclosures in its business dealings with third parties through nondisclosure agreements. (*Id.* ¶78).

### C. Liu's Employment at AbbVie

From 1997 to 2013, Liu worked at AbbVie's predecessor company, Abbott. (*Id.* ¶3). In 2013, when Abbott and AbbVie separated into two companies, Liu joined AbbVie, where he remained until he announced his retirement in September 2019. (*Id.*).

Liu worked as a Senior Research Scientist on AbbVie's BTK degrader program from at least September 2018 until September 2019. (*Id.* ¶4). While in this role, he participated in "frequent and regular discussions" with AbbVie's BTK degrader team and received reports of the team's discoveries, including "the characteristics and properties of [the degraders] impacting their pharmacological properties." (*Id.*). Liu also synthesized "BTK degrader compounds and components that he knew and understood incorporated AbbVie's trade secrets and confidential information." (*Id.* ¶48). Liu "worked directly with and/or knew of" the BTK degrader designs that AbbVie alleges BeiGene misappropriated. (*Id.* ¶66). He "had an obligation to maintain the secrecy and confidentiality" of the BTK degrader trade secrets and related confidential information that continued "even after his employment at AbbVie ended." (*Id.* ¶181).

In September 2019, Liu announced his "retirement" from AbbVie. (*Id.* ¶7). That same month, he departed from the company, initiated his AbbVie retirement benefits, and moved to Beijing, China, where he then started working at BeiGene (Beijing) Co., Ltd. as "Executive Director" of the company's Department of Chemistry. (*Id.* ¶¶7, 222).

6

### D.    BeiGene's BTK Degrader Patents

Prior to Liu's departure from AbbVie, BeiGene was developing a clinical BTK degrader candidate detailed in patent application WO 2021/018018 ("WO 018"). (*Id.* ¶92). This was the "sole" BTK degrader patent application that BeiGene filed prior to hiring Liu. (*Id.* ¶104). WO 018 included 159 examples of BTK degraders whose designs generally comprised "long, flexible linker designs" and TBL designs derived from BeiGene's BTK inhibitor zanubrutinib. (*Id.*).

In March 2020, within six months of Liu leaving AbbVie, BeiGene, Ltd. filed the first in a series of patent applications that AbbVie alleges "us[ed] and disclos[ed] the AbbVie BTK degrader trade secrets and confidential information." (*Id.* ¶9). BeiGene continued filing these applications until at least December 2022. (*Id.* ¶103).

BeiGene's post-Liu BTK degrader designs differed from both its pre-Liu designs and industry standards. AbbVie alleges that BeiGene took a "sharp change in direction" after Liu joined the company in ways that "vary significantly" from the BTK degrader structures "generally known and commonly used in the field prior to AbbVie's discoveries." (*Id.* ¶¶67, 106). BeiGene's post-Liu patent applications contained "very different" BTK degrader designs from WO 018 that closely resembled and, in some cases exactly replicated, AbbVie's alleged trade secret BTK degrader designs. (*Id.* ¶104).

AbbVie alleges that at least six post-Liu BeiGene patent applications—WO 2021/180103 ("WO 103"), WO 2021/219070 ("WO 070"), WO 2021/219071 ("WO 071"), WO 2022/268052 ("WO 052"), WO 2023/125907 ("WO 907"), and WO 2023/125908 ("WO 908")—used and disclosed AbbVie's alleged BTK degrader trade secrets. (*Id.* ¶114). In each of the six BeiGene patent applications, AbbVie identifies several examples of BTK degrader compounds containing LBL, TBL, TBL-linker, LBL-linker, or TBL-linker-LBL designs that are derived or exactly copied from AbbVie designs—including what were, in September 2019, AbbVie's three lead

BTK degrader compounds—and to which Liu had access while at AbbVie. (*Id.* ¶¶120–25, 131–36, 141–44, 149–154, 159–164, 169–74). AbbVie also alleges that defendants used its trade secrets and related confidential information for "the general discussion, synthesis, and overall disclosures" of the patents. (*Id.* ¶¶126, 137, 145, 155, 165, 175).

The six patent applications that AbbVie alleges contain misappropriated trade secrets published on September 16, 2021; November 4, 2021; December 29, 2022; and July 6, 2023. (*Id.* ¶¶117, 128, 139, 147, 157, 167). Liu's name did not appear on these applications until the fourth patent application, which was published in December 2022 and on which he was listed as one of the named inventors. (*Id.* ¶157).

BeiGene is now conducting global clinical trials, including in the United States and China, of BTK degrader compound BGB-16673. (*Id.* ¶12). AbbVie alleges that this compound "incorporates and/or is derived from AbbVie's BTK degrader trade secrets and confidential information." (*Id.*).

## III. ANALYSIS

The DTSA creates a private cause of action for misappropriation of trade secrets. To state a cognizable trade secret claim, a plaintiff must allege that "(1) their information was a trade secret; (2) it was misappropriated; and (3) it was used in the defendant's business." *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 163 F.4th 1091, 1096 (7th Cir. 2026). Defendants argue that plaintiff has failed to adequately plead both the existence of a trade secret and misappropriation. Additionally, they argue that plaintiff fails to describe the alleged trade secrets with the specificity required under the DTSA. For the following reasons, the Court disagrees and denies defendants' motion to dismiss.

### A. AbbVie Adequately Alleges the Existence of a Trade Secret.

Defendants first argue that AbbVie fails to allege the existence of a trade secret. They contend that (1) certain alleged trade secrets were contained in WO 018,[1] which was published before Liu left AbbVie and (2) AbbVie did not take "reasonable measures" to protect its alleged trade secrets.

AbbVie only needs to plausibly plead misappropriation of a single trade secret in order to survive a motion to dismiss. *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 659 (9th Cir. 2020) ("At this stage, particularly where no discovery whatsoever had occurred . . . [plaintiff's] burden is only to identify at least one trade secret with sufficient particularity."). This is so because "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original);[2] *Signal Funding, LLC v. Sugar Felsenthal Grais 7 Helsinger LLP*, 136 F.4th 718, 724 (7th Cir. 2025) (same). The Court finds that AbbVie has met its burden and that dismissal is inappropriate.

### 1. AbbVie plausibly pleads that its alleged trade secrets are not contained in WO 018.

The DTSA protects the owner of a trade secret from misappropriation of that information. 18 U.S.C. §1836(b)(1). "Information that is public knowledge or that is generally known in an industry cannot be a trade secret." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). Defendants argue that AbbVie cannot allege that structures appearing in WO 018 are trade

---

[1] The Court can properly consider WO 018 because AbbVie referenced the document in its Complaint, thus incorporating it by reference. *See, e.g.*, *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

[2] Summary judgment, by contrast, allows a defendant to chip away at parts of a plaintiff's claim to narrow the individual factual issues for trial. *Id.*

secrets because that patent application was publicly filed before Liu joined BeiGene. (Dckt. #39 at 24). They identify four allegedly trade secret structures—namely, AbbVie's linker designs L7 and L8 and LBL designs from linker-LBL 1 and linker-LBL 2—that they contend appear in WO 018.[3] (Dckt. #39 at 24–27).

As a preliminary matter, defendants' argument—that WO 018 contains four of the sixteen example structures that plaintiff identifies as trade secrets—is not dispositive. AbbVie needs to plausibly allege the misappropriation of only a single trade secret in order to state a DTSA claim. *InteliClear*, 978 F.3d at 659.

Moreover, AbbVie plausibly alleges that its trade secrets differ from the structures found in WO 018, and thus it does not—contrary to defendants' contention—"plead[] itself out of court" to the extent that its DTSA claim is premised on those structures. (Dckt. #39 at 14). In particular, with respect to the linker sub-structure, defendants contend that linker designs L7 and L8 appear in WO 018, and thus do not support AbbVie's narrative that BeiGene underwent a "sharp turn" in development after Liu's arrival. (Dckt. #39 at 24–25). To make this argument, however, defendants mischaracterize the structures that BeiGene itself defines as linkers in WO 018. In its pre-Liu patent application, BeiGene identifies linkers that contain the L7 and L8 structures *in addition to other structures*—including carbonyl and amine functional groups that plaintiff outlines in blue boxes in its opposition brief. (*See* Dckt. ##39-1 at 206–07; 42 at 28; 42-1 at 5–6). Thus, as AbbVie correctly points out, by the terms of the patent application itself, the

---

[3] Defendants also argue that the existence of identical LBL-linker structures in WO 018 and BGB-16673 defeats AbbVie's trade secret claim in its entirety. (Dckt. #39 at 26–27). This similarity is irrelevant, not only because AbbVie does not identify that particular LBL-linker design as a trade secret, but also because (1) AbbVie could state a claim by plausibly alleging misappropriation of a different trade secret and (2) the combination of that LBL-linker sub-structure with a different TBL could still plausibly constitute a trade secret, *see infra* Section III.A.1.

linker structures that BeiGene identified before Liu's arrival were longer than the linker structures that AbbVie alleges are trade secret.

Defendants' only retort in reply is that AbbVie "provides no rule in its complaint for where the linker ends and the TBL and LBL begin." (Dckt. #51 at 21). But defendants are incorrect that AbbVie needed to provide such a rule in its complaint rather than in its response brief. *See, e.g.*, *Peterson*, 986 F.3d at 752 n.2. In any event, AbbVie did not need to provide any such definition at all, given that BeiGene itself defined the bounds of its linker structures in WO 018. Defendants' mischaracterization of BeiGene's own pre-Liu linker structures matters here because AbbVie specifically defines its trade secret linker designs as those "containing relatively short and less flexible cyclic amine structures." (Dckt. #1 ¶53(i)). Given the linkers defined in WO 018 and in AbbVie's Complaint, the Court finds it plausible that AbbVie has alleged trade secret linker designs that do not appear in WO 018.

Furthermore, AbbVie defines its trade secret component designs to be those that "in combination with" certain other component designs, "have valuable pharmacological properties." (*Id.* ¶53(i)–(vi)). "[I]nformation will not necessarily be deprived of protection as a trade secret because parts of it are publicly available." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 386 (3d Cir. 2021); *see also AirFacts, Inc. v. de Amazaga*, 909 F.3d 84, 96 (4th Cir. 2018) ("Courts have long recognized that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.") (cleaned up). The Court construes plaintiff's pleadings in the light most favorable to AbbVie. *Horist*, 941 F.3d at 278. In doing so, the Court finds it plausible that even where AbbVie's structures or sub-structures appear in other public filings like WO 018, trade

11

secret combinations of those structures *with certain other sub-structures* do not.  Thus, it is plausible that WO 018 does not contain AbbVie's alleged trade secrets, and therefore that AbbVie's alleged trade secrets were not public prior to their alleged misappropriation.

### 2. AbbVie plausibly pleads that it took reasonable measures to keep its information secret.

Under the DTSA, information qualifies as a trade secret if the owner has taken "reasonable measures" to keep it secret.  *NEXT*, 163 F.4th at 1096; 18 U.S.C. §1839(3)(A).  When evaluating whether a party took "reasonable measures" to protect trade secrets, courts consider whether efforts to keep information confidential were sufficient "on a case-by-case basis, considering the efforts taken and the costs, benefits, and practicalities of the circumstances."  *DM Trans, LLC v. Scott*, 38 F.4th 608, 622 n.5 (7th Cir. 2022).  "[O]nly in an extreme case can what is a reasonable precaution be determined as a matter of law, because the answer depends on a balancing of costs and benefits that will vary from case to case."  *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003) (cleaned up).  "Typically, what measures are reasonable in a given case is an issue for a jury."  *Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007); *Lake Cnty. Press, Inc. v. Meitzler*, No 23 CV 10066, 2026 WL 575738, at *5 (N.D.Ill. Mar. 2, 2026) (same, citing cases).  Where a plaintiff alleges "specific efforts it has taken to protect the business information," that is sufficient to withstand a motion to dismiss.  *Covenant Aviation Sec., LLC v. Berry*, 15 F.Supp.3d 813, 818 (N.D.Ill. 2014).

Defendants argue that AbbVie fails to allege "reasonable measures" to keep its information secret because (1) it does not allege it implemented "differentiated heightened protection" for its trade secrets and (2) it took no action "for years" while its purported trade secrets were published.  (Dckt. #39 at 19–23).  Neither argument succeeds.

At the outset, defendants misstate the relevant standard.  As explained above, the Seventh Circuit requires only that AbbVie have in place protective measures that are "reasonable," and it is "immaterial" that AbbVie applies the same confidentiality policy to the trade secrets at issue as it does to its other confidential information even if some of that confidential information does not rise to the level of being a trade secret.  *See Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 176–77 (7th Cir. 1991).  Furthermore, the cases defendants cite to the contrary are factually distinguishable because the plaintiffs in those cases imposed far fewer protections for their trade secrets than the extensive protective policy that AbbVie alleges here.  *See Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F.Supp.3d 888, 898 (N.D.Ill. 2019) (emphasizing that a company "took almost no measures to safeguard [its] information," required no training about employees' obligation to keep certain information confidential, and employed a data security specialist who had no training in data security); *Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*, No. 17 C 923, 2018 WL 1156246, at *3 (N.D.Ill. Mar. 5, 2018) (storing the subject information on a password protected, restricted network with a non-disclosure agreement was insufficient).

Nor is it the law that a time period other than the statute of limitations exists within which plaintiffs must bring a trade secret claim.  Defendants argue that plaintiff could not have exercised "reasonable measures" to protect its trade secrets because it took "nearly three years" to file its suit after BeiGene first published a patent application allegedly misappropriating AbbVie's trade secrets.  (Dckt. #39 at 21).  But the cases that defendants cite in support of this proposition are, once again, readily distinguishable, because the courts in those cases concluded that circumstances beyond plaintiffs' timing indicated that their protective measures were not reasonable.  (*Id.* at 21–23).

13

Here, AbbVie has plausibly alleged that it took reasonable measures to protect its trade secrets.  In particular, the Complaint includes several allegations about protections specific to AbbVie's BTK degrader trade secrets: the company limits informational access to certain employees; requires each "critical function stakeholder" to approve the list of personnel with such access; requires approval from AbbVie security and IT professionals to grant access; and restricts access to the building areas and servers that store the BTK degrader trade secrets, among other protections.  (Dckt. #1 ¶¶79–90).  AbbVie further alleges that it has written policies and procedures governing its information technology; trains its employees on the company's Code of Business Conduct, including how to protect confidential and proprietary information; and protects confidential information from third-party disclosure through nondisclosure agreements. (*Id.* ¶¶78, 79, 88).  At this stage, the Court finds it plausible that these efforts constitute "reasonable" measures to protect AbbVie's trade secrets.  *See also AbbVie Inc. v. Adcentrx Therapeutics Inc.*, No. 23-CV-2290 TWR (DEB), 2025 WL 418519, at *11 (S.D.Cal. Feb. 6, 2025) ("*Adcentrx II*") (finding that similar steps constituted "reasonable" measures for protecting AbbVie's trade secrets).

For all of these reasons, the Court finds that AbbVie has adequately alleged the existence of a trade secret.

> **B.     Plaintiff Adequately Alleges Defendants' Misappropriation of AbbVie's Trade Secrets.**

Next, defendants argue that AbbVie does not adequately plead misappropriation by either Liu or the BeiGene corporate defendants.  Under the DTSA, "misappropriation can occur through any of three actions: (1) acquisition, (2) disclosure, or (3) use." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 484 (7th Cir. 2024) (cleaned up); 18 U.S.C. §1839(5).

The parties agree that Liu did not misappropriate the alleged trade secrets by improperly acquiring them, but disagree about whether AbbVie adequately alleges that Liu improperly used or disclosed trade secrets. (*See* Dckt. #42 at 15). They also disagree about whether AbbVie has stated a misappropriation claim against BeiGene. For the reasons that follow, the Court finds that AbbVie's Complaint contains sufficient allegations about both Liu and the corporate defendants to survive defendants' motion to dismiss.

"Direct evidence is not required to find misappropriation." *Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, No. 17-cv-5826, 2023 WL 5334638, at *26 (N.D.Ill. Aug. 18, 2023) (listing cases). In fact, "[c]ircumstantial evidence is acceptable, indeed even expected, in trade secret misappropriation cases." *JTH Tax LLC v. Grabowski*, No. 19 C 8123, 2021 WL 3857794, at *6 (N.D.Ill. Aug. 30, 2021) (cleaned up). Under the applicable notice pleading standard, a complaint need not "allege all of the facts essential to recovery under the plaintiff's legal theory." *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997). Indeed, a complaint may not be dismissed "unless it is impossible to prevail under any set of facts that could be proved consistent with the allegations." *Id.* (cleaned up).

AbbVie alleges that Liu misappropriated its trade secrets by "violating his obligation to maintain the secrecy of AbbVie's trade secrets, to which he had access pursuant to and exclusively as a condition of his ongoing employment by AbbVie," (Dckt. #1 ¶201)—in other words, by "improperly using the information without [AbbVie's] consent," *CoMentis, Inc. v. Purdue Rsch. Found.*, 765 F.Supp.2d 1092, 1101 (N.D.Ind. 2011). Like other plaintiffs who have survived a motion to dismiss their DTSA claims, AbbVie alleges Liu's access to key information while employed at AbbVie, as well as "suspicious circumstances concerning [Liu's] departure," including resigning from AbbVie and then "almost immediately" taking a similar position at a

different company. *BCD Tech. Holdings, LLC v. Paragon Micro, Inc.*, No. 25 CV 6944, 2026 WL 788078, at *8 (N.D.Ill. Mar. 20, 2026).

Moreover, AbbVie alleges a rapid timeline between Liu joining BeiGene and defendants' subsequent publication of patent applications misappropriating AbbVie's trade secrets. *See 3M v. Pribyl*, 259 F.3d 587, 596 (7th Cir. 2001) ("While it took [plaintiff] six years and countless resources in order to make its carrier tape operation efficient and profitable, [defendant] was able to almost immediately operate."); *Harbor Bus. Compliance Corp. v. Firstbase.io, Inc.*, 152 F.4th 516, 531 (3d Cir. 2025) (noting the "accelerated nationwide launch" of defendant's services as evidence of trade secret appropriation); *Adcentrx II*, 2025 WL 418519, at *13 (finding relevant the "impossibly fast timeframe" of defendant's product development). AbbVie alleges a "sharp change in direction of BeiGene's BTK degrader program" after Liu's arrival. (Dckt. #1 ¶106). And AbbVie identifies six of BeiGene's post-Liu patent applications that it alleges contain trade secret designs, including one that depicts, "*in sequence*, exact replicas" of three trade secret linker designs "that were being used in AbbVie's three lead BTK degrader compounds in September 2019, just prior to Liu's departure." (Dckt. #42 at 17–18); *see Yeiser Rsch. & Dev. LLC v. Teknor Apex Co.*, 281 F.Supp.3d 1021, 1048 (S.D.Cal. 2017) (finding relevant the allegation that public promotions for an allegedly misappropriating product "incorporate[d] attributes of [plaintiff's] concept"). These pleadings, which the Court takes as true on a motion to dismiss, permit the plausible inference that defendants improperly used or disclosed AbbVie's BTK degrader trade secrets after Liu moved to BeiGene.

Defendants' counterarguments are unavailing. First, defendants argue that AbbVie fails to state a claim for improper use or disclosure because AbbVie only pleads facts concerning Liu's access to the alleged trade secrets, and none alleging that Liu "took . . . tangible

16

information," (Dckt. #39 at 7), or improperly used or disclosed a trade secret, (Dckt. #51 at 8 n.3). As a matter of law, "trade secrets can exist in employees' memories; a trade-secret plaintiff does not need to show that an actual document was taken." *Adcentrx II*, 2025 WL 418519, at *13. Moreover, in support of their argument, defendants primarily cite cases concerning a claim of misappropriation through improper acquisition, rather than through improper use or disclosure. (Dckt. #51 at 8 n.3) (*citing* Dckt. #39 at 15–16)). And in the remaining cases defendants cite, plaintiffs stated far fewer facts about how the alleged trade secrets were obtained or eventually used in a relevant act of misappropriation. *See Packaging Corp. of Am., Inc. v. Croner*, 419 F.Supp.3d 1059, 1066 (N.D.Ill. 2020) ("PCA primarily bases the allegations in its complaint of unauthorized disclosure on the fact that Croner admits to having solicited some of his former clients from PCA."); *AbbVie Inc. v. Adcentrx Therapeutics Inc.*, No. 3:23-cv-02290-BEN-DEB, 2024 WL 3611144, at *6–7 (S.D.Cal. July 29, 2024) ("*Adcentrx I*") ("There are no allegations that Defendant Lee developed or worked on the specific trade secret drug that Plaintiff identifies."). Here, in contrast, AbbVie includes undisputed allegations about Liu's involvement in developing the BTK degrader compounds at issue, and identifies several patent applications incorporating the alleged trade secrets, including one where he was listed as one of the named inventors. (*See, e.g.*, Dckt. #1 ¶¶66, 114, 157).

Furthermore, AbbVie need not, as defendants contend, allege facts to overcome the inference that "supposedly 'new' structures" in post-Liu patent applications "were not the result of continuing work" on BeiGene's pre-existing BTK degrader program. (Dckt. #51 at 9). Nor is it damning that AbbVie relies on "inference" to state its claim. (*Id.* at 6). Inferences must be drawn in favor of AbbVie on a motion to dismiss and all AbbVie must do is plead facts sufficient to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. Because

17

AbbVie can rely on circumstantial evidence to do so, "[d]efendants' inferences argument necessarily fails at this early stage." *Xavian Ins. Co. v. Boeing Cap. Corp.*, No. 18 C 6222, 2019 WL 4750105, at *5 (N.D.Ill. Sep. 30, 2019).

Lastly, defendants argue that AbbVie has not pleaded facts sufficient to plausibly allege misappropriation by the BeiGene corporate defendants. But here, the Complaint alleges that BeiGene "identified, targeted, and recruited Liu because of his access to and involvement in AbbVie's BTK degrader program," (Dckt. #1 ¶6), and BeiGene published patent applications containing the alleged trade secrets shortly after Liu's arrival at the company. These allegations, which are sufficient to state a claim against Liu, are also sufficient to state a claim against the BeiGene corporate defendants. "At the very least, the allegedly implausible development timeline concurrent with the influx of [a] former plaintiff employee[] reasonably implies that defendant company 'had reason to know' that the competitor project was improperly derived in part from the plaintiff's trade secrets." *Adcentrx II*, 2025 WL 418519, at *13 (cleaned up), *quoting Wisk Aero LLC v. Archer Aviation Inc.*, No. 3:21-CV-02450-WHO, 2021 WL 8820180, at *15 (N.D.Cal. Aug. 24, 2021).[4] Where, as here, "a plaintiff states a plausible claim for relief under one discernable legal theory, we start and end there" under Rule 12(b)(6). *Signal Funding*, 136 F.4th at 724 (cleaned up); *BBL, Inc*, 809 F.3d at 325. Therefore, the Court need not reach plaintiff's arguments about alternative theories for holding the BeiGene corporate defendants liable. (Dckt. #42 at 21–22).

---

[4] *Cf. Opus*, 2018 WL 1156246, at *2 (dismissing trade secrets claims where plaintiff alleged no corporate employment relationship between the defendants); *C. Pepper Logistics, LLC v. Lanter Delivery Sys., LLC*, No. 4:20-cv-01444-MTS, 2021 WL 3725680, at *9 (E.D.Mo. Aug. 23, 2021) (same); *Arthur J. Gallagher & Co. v. Tarantino*, 498 F.Supp.3d 1155, 1173 (N.D.Cal. 2020) (dismissing trade secret claim against corporate defendant where complaint relied on conclusory allegations about company directing employers to engage in misappropriation).

Accordingly, the Court finds that AbbVie has adequately alleged misappropriation by defendants.

### C. Plaintiff Specifies the Alleged Trade Secrets with the Requisite Specificity.

Finally, defendants contend that AbbVie has failed to describe the trade secrets at issue with adequate specificity to put defendants on notice of the alleged misappropriation. The Court disagrees.

"Claims under the DTSA are not subject to a heightened pleading standard." *Adcentrx II*, 2025 WL 418519, at *12. While at the summary judgment stage, "[o]ur case law requires a high level of specificity when a plaintiff makes a claim for misappropriation of a trade secret," *NEXT*, 163 F.4th at 1096 (cleaned up), at the pleading stage, "[p]laintiffs can plead this element 'in broad strokes,'" *BCD Tech.*, 2026 WL 788078, at *7, *quoting Croner*, 419 F.Supp.3d at 1066. "[C]ourts only dismiss a claim for lack of specificity on the pleadings in the most extreme cases." *Sonrai Sys. LLC v. Waste Connections, Inc.*, 658 F.Supp.3d 604, 614 (N.D.Ill. 2023) (cleaned up). And, as stated earlier, plaintiffs only need to plausibly identify "one trade secret" to survive a motion to dismiss. *InteliClear*, 978 F.3d 659.

AbbVie alleges nine categories of trade secret that encompass the following: certain of its BTK degrader component and compound designs, (Dckt. #1 ¶53(i)–(vi)); scientific information and data about how modifying those designs affects BTK degraders' pharmacological properties, (*id.* ¶53(vii)); and various information about AbbVie's BTK degrader program, (*id.* ¶53(viii)–(ix)).

With respect to categories (i) through (vi), AbbVie has alleged its trade secret designs at an adequate level of specificity. Identifying a particular tool or invention can be sufficiently specific to state a trade secret claim. *See AutoMed Techs., Inc. v. Eller*, 160 F.Supp.2d 915, 921 (N.D.Ill. 2001) (finding a complaint adequately pled where it specified what software and source

code constituted trade secrets). AbbVie identifies specific elements of its BTK degrader component designs that it alleges contribute to the degraders' unique pharmacological properties: "relatively short and less flexible cyclic amine structures" in its linker designs, "structurally-tailored and optimally-oriented BTK scaffolds" in its TBL designs, and LBL designs "devoid of thalidomide-, lenalidomide-, or pomalidomide-based chemical structures." (*Id.* ¶53(i)–(iii)). AbbVie even includes diagrams of allegedly trade secret linker, TBL, TBL-linker, and LBL-linker designs. (*Id.* ¶¶54, 56, 58, 60). These details are sufficiently specific to put defendants on notice at the pleading stage. *See Adcentrx II*, 2025 WL 418519, at *12; *cf. NEXT*, 163 F.4th at 1096 (rejecting trade secret claim at summary judgment where company did not "identify any specific algorithms, source code, or methodologies underlying the [tool's] functionality").

Although the remaining three categories of trade secrets arguably present a closer question, they are "sufficiently tethered to the first [six] categories of trade secrets such that AbbVie's allegations suffice to put [d]efendants on notice." *Adcentrx II*, 2025 WL 418519, at *12; *see Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F.Supp.3d 915, 921–22 (N.D.Ill. 2016) (finding that trade secret allegations concerning "a method for collecting standardized data" and "software design specifications" were adequately specified); *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F.Supp.2d 846, 850 (N.D.Ill. 2011) (same, for trade secrets concerning "various . . . proprietary, confidential, and non-public information from which [plaintiff] obtains revenue and competitive advantage" related to a specific invention). Furthermore, because "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims," AbbVie's Complaint survives defendants' motion to dismiss in its entirety. *BBL, Inc.*, 809 F.3d at 325.

20

**CONCLUSION**

For the reasons set forth above, the Court denies defendants' motion to dismiss. (Dckt. #38). Defendants are ordered to answer by June 2, 2026. The stay on discovery is lifted. By May 18, 2026, the parties shall file a joint status report setting forth a proposed schedule for the completion of fact and expert discovery and providing an update on the status of their settlement negotiations. The in-person status hearing scheduled for May 15, 2026 at 2:30 p.m. is rescheduled to May 21, 2026 at 2:30 p.m.

**DATE:** **May 12, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**